**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRAMMO, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>DAVID SMOTHERMON,<br><br>               Defendant. | Civil Action No. 1:22-cv-4446<br><br>JURY TRIAL DEMANDED |

Plaintiff Trammo, Inc. ("Trammo") by and through its attorneys, DLA Piper LLP (US), for its Complaint against Defendant David Smothermon ("Defendant" or "Smothermon") alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:[1]

### NATURE OF THE ACTION

1.  This action arises out of Smothermon's scheme to enrich himself by defrauding Trammo through the concealment of substantial losses suffered from his commodities trading activity on behalf of Trammo.  Smothermon was a long-time trusted employee and executive of Trammo and a member of Trammo's Board of Directors.  Smothermon abused this trust and his position within the Trammo organization and by his actions nearly destroyed this privately-owned company which had been in existence for more than fifty years.

2.  During the relevant time period, Smothermon was the President and Head Trader of Trammo's Gas Division and was based in Houston, Texas.  This division engaged in the physical trading of natural gas liquids (such as ethane, propane, butane, isobutene and natural gasoline) as

---

[1] The Complaint's allegations are based, *inter alia,* on Trammo's own investigation, the civil complaint filed by the Commodity Futures Trading Commission ("CFTC") against Smothermon in *Commodity Futures Trading Commission v. Smothermon*, 2:19-cv-04185-GBD (S.D.N.Y.), and the criminal complaint filed by the U.S. Attorney's Office for the Southern District of New York against Smothermon in *USA v. Smothermon*, 1:19-cr-00382-AKH (S.D.N.Y.).

well as derivative financial instruments related to those commodities such as futures, options on futures and over-the-counter ("OTC") swaps.  As part of his scheme to defraud Trammo, Smothermon circumvented Trammo's internal controls to make false entries in Trammo's accounting system related to the Gas Division's trading activity in order to cover up growing trading losses.

3.     Smothermon's fraud was two-pronged.  He routinely and deliberately mismarked the values of futures positions, which, as a result, were grossly inconsistent with the marks provided by Trammo's futures commissions merchant ("FCM") and by NYMEX, a designated contract market with its principal place of business in New York, New York.  Smothermon also directed operations employees in the Gas Division to enter false contractual price and volume terms into Trammo's accounting system for physical trades contracted between Trammo and counterparties.  Both prongs of Smothermon's fraud caused Trammo to grossly overstate the value of the positions in the Gas Division trading book and to conceal enormous losses.  As Smothermon knew, Trammo's management relied heavily on these figures in managing and operating the company and in awarding compensation to employees in the Gas Division.

4.     Smothermon engaged in this fraudulent conduct in order to maintain his position at Trammo and to secure millions of dollars of bonus compensation awarded by Trammo in May 2016, including (a) a bonus and phantom equity contribution totaling $15,080,000 awarded to Smothermon (a portion of which was deferred and later forfeited when he resigned) and (b) $3,899,000 in bonuses and phantom equity contributions awarded to other employees in the Gas Division in Houston.  That bonus compensation would not have been awarded if Trammo had known the truth about the magnitude of Smothermon's trading losses or that he was engaged in a criminal scheme designed to conceal those losses from Trammo.

5.     In addition to enabling Smothermon to obtain undeserved bonus compensation, Smothermon's concealment of his fraudulent scheme resulted in disastrous additional losses for Trammo – losses that Trammo could have avoided if it had known the truth about Smothermon's trading losses in real time.  When Smothermon abruptly resigned in September 2016, as his fraud was about to be discovered, Trammo's records, which had been manipulated by Smothermon, falsely showed losses in the Gas Division trading portfolio of approximately $40 million.  A subsequent investigation and forensic review, the correction of Smothermon's false entries and revaluation of the book using third-party valuations, revealed that there were actually total losses in the book of approximately $242 million – more than two-thirds of Trammo's entire net worth.

6.     The losses that Smothermon incurred and covered up for months almost destroyed Trammo.  Among other things, they caused Trammo to default on its obligations to lenders under its revolving credit agreement, and forced Trammo to engage in a painful and costly restructuring involving the closing of offices, to withdraw from major businesses including petrochemicals and fertilizers, and to terminate hundreds of employees.  To this day, Trammo employs fewer than one-third of the number of employees that it did when Smothermon's fraud was uncovered.

7.     Not surprisingly, Smothermon's egregious conduct attracted the attention of federal criminal and civil authorities.  In November 2018, Smothermon was arrested and charged by the United States Attorney's Office for the Southern District of New York with federal criminal wire fraud arising from his scheme to defraud Trammo (the "Criminal Action").  Smothermon's criminal case is pending and his trial is currently scheduled for November 2022.  In May 2019, the CFTC sued Smothermon in the United States District Court for the Southern District of New York for fraud under the Commodity Exchange Act and regulations thereunder (the "CFTC Action"). The CFTC Action is currently stayed at the CFTC's request and on consent of the parties pending

the outcome of the Criminal Action.

8.    The allegations set forth herein state causes of action against Smothermon for fraud, constructive fraud, constructive trust, breach of fiduciary duty, faithless servant, unjust enrichment, and money had and received as to which Smothermon is liable to Trammo for compensatory and punitive damages and for equitable relief including, but not limited to, disgorgement of and reimbursement to Trammo of the proceeds of his fraudulent scheme and of all amounts that he wrongfully received.

**PARTIES**

9.    Plaintiff Trammo is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 8 West 40th Street, New York, New York 10018. Founded in 1965, Trammo is a global commodity merchandiser engaged in the marketing, trading, distribution and transportation of a wide variety of commodity products.

10.    Smothermon is a resident of Texas residing at 3118 Pleasant Cove Court, Houston, Texas 77059-3232.

**JURISDICTION AND VENUE**

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of New York and Delaware and a citizen of Texas and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.    The Court has personal jurisdiction over Smothermon under New York Civil Practice Law and Rules ("CPLR") § 302 and the U.S. Constitution because directly or through an agent:

(a) Smothermon transacted business within the state and the events giving rise to this action

4

have a substantial nexus to New York; or

(b) Smothermon committed a tortious act within the state; or

(c) Smothermon committed a tortious act without the state causing injury to person or property within the state and (i) regularly conducted and solicited business, or engaged in a persistent course of conduct, or derived substantial revenue from goods used and consumed and services rendered, in the state, or (ii) expected or should reasonably have expected the act to have consequences in the state and he derived substantial revenue from interstate or international commerce.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this judicial district and division.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.    Smothermon's Positions at Trammo

14.     In 2005, Trammo hired Smothermon to work in Trammo's Gas Division, which was engaged in the purchase and sale of natural gas liquids, such as ethane, propane, butane, isobutane, and natural gasoline.

15.     In 2011, after the sudden death of his predecessor, Smothermon was promoted to President and Head Trader of the Gas Division.  In January 2016, Smothermon was appointed to Trammo's Board of Directors.

### B.    Smothermon's Responsibilities at Trammo

16.     As Head Trader of the Gas Division, Smothermon traded various natural gas related financial derivative products, including futures, options on futures, and OTC swaps.  Beginning in

2012, Trammo conducted its futures transactions and cleared swap transactions through Newedge, an FCM, which in May 2014 was acquired by Société Générale ("SG").

17.     Smothermon's responsibilities as Head Trader of the Gas Division also included physical trading of natural gas liquids in interstate commerce, including forward contracts to be physically settled.   In addition, beginning in 2012, physical trading by the Gas Division also included the purchase, throughput and sale of propane for delivery to and lifting from Trammo's refrigerated propane terminals in Newington, New Hampshire and Tampa, Florida (the "Terminals").   Another trader in the Gas Division (the "Other Trader") was given day-to-day responsibility, under Smothermon's supervision, for trading activity involving the Terminals.

18.     Trammo was required by U.S. Generally Accepted Accounting Principles to mark-to-market the values of the positions in its trading book.   Throughout his employment with Trammo, one of Smothermon's responsibilities was accurately valuing and reporting to Trammo and entering in Trammo's books and records, maintained through its computerized Trading and Traffic system (the "T&T System"), the fair market value of these positions.

19.     Smothermon's portfolio of futures was very large, containing, at the time of his resignation, 2,180 individual positions.   Smothermon was responsible for ensuring that accurate information regarding the current value of each of those positions was entered into the T&T System and updated on a daily basis.   This involved Smothermon directing the manual entry of such information into the T&T System by operations and accounting personnel working with him in Houston.   Because of the massive size of the futures book and the enormous volume of transactions, management depended on Smothermon to ensure that the information entered in the T&T System concerning these positions and the reports generated were accurate and timely. Smothermon represented to Trammo that his assessment of these values was done on a completely

objective basis and was accurate and reliable.  In prior years, independent auditors had reviewed Smothermon's assessments of these values in connection with Trammo's annual audit and had not required any adjustment.  Trammo's management trusted Smothermon and relied completely upon him to provide accurate and timely information.

20.     Smothermon also caused operations personnel in Houston to enter into the T&T System information regarding OTC derivative and forward physical transactions.  His practice was to convey to one of two operations employees in the Gas Division the terms of each such transaction (e.g., product, quantity, price, and/or delivery month) with instructions to prepare a written contract (unless the contract was prepared by Trammo's counterparty) and to enter information regarding the terms of the contract into the T&T System.  The Other Trader used the same approach for the entry of information regarding transactions involving the Terminals into the T&T System.  Any changes to the terms entered into the T&T System could be made by operations employees only at Smothermon's direction.  Again, Trammo's management relied on Smothermon to ensure that the information in the system on the terms of physical transactions was accurate.

21.     Smothermon's responsibilities as Trammo Gas Division President also included ensuring compliance with Trammo's risk management requirements.  Among other things, this required the preparation and transmission to Trammo's management of detailed reports which were intended to provide regular and continuing transparency on the Gas Division's financial and physical trading.  Under Smothermon's direction, various reports summarizing the Gas Division's positions were prepared by accounting personnel in Houston based on mark-to-market prices and other information provided by Smothermon.

22.     As head of the Gas Division, Smothermon was also responsible for the implementation of Trammo's risk policy and procedures.  Among other things, he was responsible

for ensuring that trading complied with limits placed on the Gas Division under those policies and procedures and to report to Trammo's management and to take immediate action when breaches occurred.

### C.    Smothermon's Fraudulent Mismarking of the Gas Division's Positions

23.    Prior to 2016, Smothermon appeared to be trading and reporting his trades consistently with Trammo's policies.  From early 2016 until he abruptly resigned on September 1, 2016, he ceased to do so.  During that period, Smothermon experienced substantial and mounting losses in his trading book.  Instead of reporting those losses to Trammo's management, he concealed them and fraudulently misrepresented the true value of the Gas Division's trading positions.  This was done in at least two ways.

24.    First, Smothermon routinely and deliberately mismarked the market value of his futures positions in the T&T System and in the reports provided to Trammo's management on a regular basis.  Smothermon's marks were grossly inconsistent with the marks provided by Trammo's FCM and by NYMEX.

25.    Second, as discussed in greater detail below, during the spring and summer of 2016, Smothermon directed operations employees to enter false contractual prices and volume terms into the T&T System for physical trades and OTC swaps entered into between Trammo and counterparties.  Smothermon directed that this be done not only for trades that he concluded but also for trades concluded by the Other Trader for deliveries to the Terminals.

### D.    Smothermon Fraudulently Misrepresents the Value of His Positions in Order to Secure a Massive Bonus

26.    Smothermon's motives for concealing the magnitude of his losses are clear.  In addition to a substantial salary, Smothermon's compensation as Trammo Gas Division President typically included an annual bonus.  Whether to award a bonus and in what amount was a

discretionary determination made by members of Trammo's Compensation Committee.  It was based, in substantial part, on the performance of the Gas Division (i.e., the profits or losses it generated) in the prior year.  The Gas Division had a record year in 2015 with profits of approximately $61 million.  Therefore, Smothermon anticipated receiving a huge bonus – millions of dollars.

27.   Smothermon knew, however, that bonuses at Trammo for any year were completely discretionary and that they could be affected by performance in prior or subsequent years.  He knew, for example, that in years in which any Trammo division incurred a loss, the bonus pool for that division for the following year would be reduced by the loss amount.  He also knew that, as bonuses for any given year were typically not paid until the end of May of the following year (after issuance of Trammo's audited financial statements) anticipated losses based on trading results for the first five months of the current year could substantially reduce or even eliminate the bonus to be paid in such year for the prior year's performance.

28.   Smothermon did not wish to jeopardize the massive bonus that he was anticipating after a successful 2015.  Therefore, he fraudulently mismarked his trading positions in order to conceal the huge losses that he was incurring in 2016.  For example, as of March 31, 2016, the T&T System, using the values of futures positions entered by Smothermon, was showing year to date losses in the futures book of approximately $700,000.  In fact, based on third-party valuations of those positions, the year-to-date losses in the futures book as of March 31, 2016, were in excess of $68 million – $7 million more than the profits that the Gas Division had earned in 2015.

29.   Smothermon's fraudulent conduct achieved his desired result.  In May 2016, Trammo decided to award to Smothermon a bonus of approximately $14.5 million plus a phantom equity contribution of $580,000 for a total of $15,080,000.  Smothermon was paid 80 percent of

his bonus, $11.6 million, in May 2016, with 20 percent deferred in accordance with Trammo's deferred compensation plan.  Smothermon forfeited his deferred compensation and phantom equity when he resigned on September 1, 2016. Trammo also awarded and paid $3,899,000 in bonuses and phantom equity contributions to other Houston employees of the Gas Division.

30.     Trammo would not have awarded or paid any bonuses or phantom equity to any of the Houston employees of the Gas Division in May 2016 if Trammo had known the actual value of Smothermon's positions as of that date.

**E.     Smothermon's Continuing Fraudulent Conduct During the Summer of 2016**

31.     During the summer of 2016, Smothermon continued to falsify company records and reports and to otherwise misrepresent the value of his positions to Trammo's management and to its Board of Directors.  During that period, Smothermon had several discussions with Trammo executives in which he represented that the Gas Division's futures book had broken even for the first three months of the year and would be down approximately $5 million or $6 million in the second quarter of the year.  He repeatedly reassured Trammo executives and board members in e-mail and telephone communications that he was working to reduce the size of Trammo's futures book to manage and minimize the reported losses sustained by the Gas Division (which, although significant, were far less than the actual losses concealed by Smothermon's fraud).

32.     Smothermon's representations were false and misleading and intended to shield him from scrutiny so that he could continue to perpetrate his ongoing scheme, keep his bonus and keep his job.  As it became clear that his positions were not improving and that he could not trade his way out of the massive losses that he had incurred, he became even more desperate.

33.     On multiple occasions over the summer of 2016, Smothermon directed Trammo employees to enter in the T&T System false information concerning the terms of various physical

trading deals to make them appear more favorable to Trammo to deceive Trammo's management as to the magnitude of his losses.  Indeed, as a result of such false entries, the T&T System and daily position reports inflated the potential profits of the Gas Division by approximately $35 million.  The complaints in the Criminal Action and the CFTC Action contain examples of Smothermon's false entries including the following:

***The March 8 Contract***

34.     On or about March 8, 2016, Smothermon entered into a contract on behalf of the Gas Division for purchase of a total of 40,000 metric tons of propane at a floating market price, with delivery of 20,000 metric tons to be made on or before October 31, 2016, and the remainder to be delivered in or about the second half of January 2017 (the "March 8 Contract").

35.     On or about March 9, 2016, one of the Gas Division's operations employees entered the March 8 Contract into the T&T System correctly, recording each of the two contracted deliveries as a separate contract for the purchase by the Gas Division of 10,500,000 gallons of product (equal to approximately 20,000 metric tons) at a floating market price to be delivered at Trammo's terminal in Newington, New Hampshire.

36.     On or about August 1, 2016, Smothermon used the "notes" function in his Outlook e-mail program to write an Outlook note reminding himself to fraudulently alter the record of this contract, which was profitable to Trammo, by doubling the quantity to be delivered in January so that the profit in the position would be doubled.  The Outlook note read, in substance and in part, "Double Jan cargo w/[Counterparty-1] to 40kt[.]"

37.     On August 1, 2016, Smothermon directed one of the operations employees to double the quantity of the January 2017 delivery.  He handed to the employee a Post-it Note in his handwriting listing this and other changes to be made in the T&T System.  Among other changes,

next to the contract number used to identify the January 2017 delivery of the March 8 Contract in the T&T System, Smothermon wrote: "21,000,000 gals[.]"  In accordance with Smothermon's direction, reflected in the Post-it Note he had given the employee, the employee doubled in the T&T System the quantity of the January 2017 delivery to be purchased by Trammo from 10,500,000 gallons to 21,000,000 gallons (i.e., from approximately 20,000 metric tons to approximately 40,000 metric tons).  In fact, the entry was entirely false.  The terms of the March 8 Contract had not been amended and there was no legitimate justification for the instruction given by Smothermon to double the quantity of the January delivery.

38.     As a result of the fraudulent entry made in the T&T System at Smothermon's direction, the T&T System and the subsequent daily position reports and other reports generated from the system overstated the potential gains to be made by the Gas Division on the March 8 Contract by approximately $2,100,000.

### The July 14 Contract

39.     On or about July 14, 2016, the Other Trader entered into a contract on behalf of the Gas Division to purchase 66,000 metric tons of propane at a floating market price based on published prices at the time of delivery (the "July 14 Contract").  The July 14 Contract called for product delivery in two shipments, the first between April 1, 2017 and June 30, 2017, and the second between December 1, 2017 and February 28, 2018.

40.     On or about July 14, 2016, an operations employee entered the July 14 Contract into the T&T System correctly, noting that the contract was for the purchase of 34,372,800 gallons (equal to approximately 66,000 metric tons) of propane.  On or about the same day, this employee changed the price entered in the system from a floating price to a fixed price of $0.58 per gallon which, upon information and belief, reflected the actual market price.

41.     On multiple occasions between July 26, 2016 and August 5, 2016, at Smothermon's direction, operations employees made changes in the T&T System to the price for the purchase of propane under the July 14 Contract and to the quantity to be purchased to make the contract appear more profitable to Trammo.

42.     On or about July 26, 2016, at Smothermon's direction one employee lowered the price in T&T to $0.48 per gallon.  On or about August 3, 2016, at Smothermon's direction the other employee further lowered the price to $0.43 per gallon.  These changes did not correspond to any changes in the actual market price.

43.     On or about August 1, 2016, Smothermon used the "notes" function in the e-mail program Outlook to write an Outlook note reminding himself to, in substance and in part, "Double ca118 cargo with [the counterparty on the July 14 Contract] to 132kt."  Accordingly, on or about August 1, 2016, Smothermon directed one of the operations employees to double the volume of propane to be purchased by Trammo.  Smothermon's instruction was contained in a Post-it Note handed to the employee, on which, next to the contract number used to identify the July 14 Contract in the T&T System Smothermon wrote: "68,745,600 gals[.]"  At Smothermon's direction, reflected in the Post-it Note he had given the employee, on or about August 3, 2016, this employee doubled in the T&T System the volume to be purchased by Trammo to 68,745,600 gallons of propane (or approximately 131,949 metric tons).  The July 14 Contract had not been amended and there was no legitimate justification for the actions directed by Smothermon.

44.     Because of the false entries made in the T&T System at Smothermon's direction, the system falsely showed that the July 14 Contract provided for the Gas Division to purchase substantially more product at a substantially lower price than the quantity and price agreed in the July 14 Contract.  As a result, the T&T System and the daily position reports generated from the

system again overstated the gains to be made by the Gas Division on the July 14 Contract by approximately $19,300,000.

***The November 13 Contract***

45.     On or about November 13, 2015, Smothermon entered into a contract on behalf of the Gas Division to sell 150,000 barrels of propane on a monthly basis between January 1, 2017 and December 31, 2017 at a price of approximately $0.435 per gallon (the "November 13 Contract").

46.     On or about November 13, 2015, one of the operations employees entered the November 13 Contract into the T&T System, correctly noting that the contract was for the sale of propane in multiple shipments at a fixed price of $0.435 per gallon.

47.     On or about August 1, 2016, at Smothermon's direction this employee increased the price entered in the T&T System for several shipments under the November 13 Contract to $0.535 per gallon.  These entries were false as the November 13 Contract had not been amended to increase the price.

48.     Because of the changes made in the T&T System at Smothermon's direction, the system falsely indicated that the Gas Division had contracted to sell the product to be delivered under the November 13 Contract at a price substantially higher than the price agreed in that contract.  As a result, the T&T System (and the subsequent daily position reports generated from the system) inflated the gains to be made by the Gas Division on the November 13 Contract by approximately $5,670,000.

***The March 31 Contracts***

49.     On or about March 31, 2016, Smothermon entered into two contracts on behalf of the Gas Division with one counterparty (collectively, the "March 31 Contracts").  Under the first

contract, the Gas Division agreed to sell and deliver to the counterparty 75,000 barrels of propane per month between January 1, 2017 and December 31, 2017 at a price of approximately $0.55875 per gallon (the "First March 31 Contract").  Under the second contract, the Gas Division agreed to sell and deliver to the same counterparty 125,000 barrels of propane per month between January 1, 2017 and December 31, 2017 at a price of approximately $0.55875 per gallon (the "Second March 31 Contract").

50.     On or about March 31, 2016, one of the operations employees correctly entered the March 31 Contracts into the T&T System as the sale of propane in multiple shipments at a fixed price of $0.5588 per gallon.  On or about August 1, 2016, at Smothermon's direction one of the operations employees increased the prices entered in the T&T System for several shipments of the March 31 Contracts to $0.6587 per gallon.  The entries made at Smothermon's direction were false as the March 31 Contracts had not been amended.

51.     Because of the changes made in the T&T System at Smothermon's direction, the T&T System falsely indicated that the Gas Division had contracted to sell product under the March 31 Contracts at a substantially higher price than the prices actually agreed in those contracts.  As a result, the T&T System (and the subsequent daily position reports generated from the system) inflated the gains to be made by the Gas Division on the March 31 Contracts by approximately $7,560,000.

## F.     Smothermon's Continued Mismarking of his Futures Positions

52.     In addition to entering in the T&T System false information regarding the terms of individual physical transactions to inflate the potential value of such transactions to Trammo, Smothermon continued to mismark the value of the futures positions he had taken in the commodities markets.  There was clear evidence of mismarking, both upward for long positions

and downward for short positions, to overstate profits and understate losses.  As a result, as of August 31, 2016, the day before Smothermon abruptly resigned from Trammo after over a decade of working in the Gas Division, Smothermon's marking of his trading book grossly overstated the value of his positions and fraudulently concealed the extent of his losses.

53.     For example, Smothermon's marking of his trading book's large positions in Mont Belvieu ethane futures – as compared to NYMEX daily settlement marks as well as the marks of Trammo's FCM – overstated the values of those positions by approximately $32 million.

54.     As a further example, as of August 31, 2016, Smothermon's marking of his book's Mont Belvieu propane futures positions overstated their value by approximately $35 million when compared with NYMEX's daily settlement marks and the true mark-to-market values provided by Trammo's FCM.

55.     As a third example, as of August 31, 2016, Smothermon's marking of his book's Northwest Europe propane futures positions overstated their value by approximately $12 million when compared with NYMEX's daily settlement marks and the true mark-to-market values provided by Trammo's FCM.

56.     By his fraudulent mismarking of futures positions, and his fraudulent entry in the T&T System of false contractual price and volume terms for physical contracts and through other deceitful conduct, Smothermon falsely misrepresented the profits and losses of the Gas Division in the T&T System, in the reports provided to Trammo's management, and in Trammo's books and records.

## G.     Trammo Uncovers Smothermon's Scheme

57.     As a result of Smothermon's mismarking of his futures positions and fraudulent entry of false information concerning physical and OTC derivative contract terms, the T&T

System and reports to Trammo's management falsely indicated on August 31, 2016, that the Gas Division's losses for 2016 were approximately $40 million when, in fact, after revaluation using third-party marks and correction of the false entries, there were total losses of approximately $242 million.  Smothermon knew that Trammo relied on the value of his positions conveyed by the Gas Division to make material business decisions, that the losses that he was incurring were unsustainable and potentially devastating to Trammo, and that his concealment of the actual magnitude of those losses prevented Trammo from taking corrective action, which, if accurate information had been disclosed early on, may have included shutting down the Gas Division, closing its positions before they deteriorated further and terminating Smothermon's employment.

58.     In or around late August 2016, Smothermon was notified that Trammo intended to perform an internal audit of the Gas Division and that a team from New York would shortly be coming to Houston to begin the process.

59.     On September 1, 2016, days before the audit began, Smothermon abruptly resigned after confessing to Trammo's Chief Financial Officer that he had mismarked positions in his trading book to conceal significant losses.

60.     On or around September 1, 2016, Smothermon admitted to the Other Trader that his trading losses far exceeded the amounts previously reported to Trammo.  Specifically, in response to a text message inquiring "how bad is the book?" Smothermon stated in part "Honestly, I don't even know at this point" and that it was "Probably close to -$90mil maybe[.]"

61.     Following Smothermon's resignation, Trammo directed an internal review of the physical trading contracts on the Gas Division's books that were open as of August 31, 2016.  The review unearthed the false entries and resulting overstatement of profits.

62.     Trammo also discovered through the internal review that Smothermon's purported mark-to-market valuation of the Gas Division's futures positions had vastly misstated the value of those positions when compared to third-party valuations, overvaluing long positions and undervaluing short positions.

63.     The correction of the false entries in the system and the revaluation of the book using third-party valuations showed that, instead of the approximately $40 million in losses shown in the T&T System, there were total losses in the books of approximately $242 million.

64.     After discovering that the Gas Division trading book was grossly mismarked, Trammo was forced to unwind numerous positions at significant losses to Trammo.  At the conclusion of the unwinding, the total realized loss was approximately $228 million.

65.     The impact to Trammo of this loss, representing approximately two-thirds of its entire net worth, was catastrophic.  Among other things, as a direct, foreseeable result of Smothermon's scheme, Trammo defaulted on its obligations to lenders under its revolving credit agreement and its term loan agreement.

66.     Trammo was forced by its lenders to engage in a painful and expensive restructuring process.  Among other things, Trammo was compelled to withdraw from a number of businesses, including, in late 2016, the petrochemicals business and in 2017 and 2018 from the fertilizer business, because the capital requirements of those businesses could no longer be supported by Trammo's reduced net worth.  Trammo was also compelled to sell assets, including its LPG terminals in Newington, New Hampshire.  Through waves of layoffs and resignations, Trammo's staff worldwide was reduced by 70 percent, from 476 employees in September 2016 when Smothermon's fraud was discovered, to 139 employees in May 2022.

67.     After   Smothermon's   fraud   was   discovered,   it   was   questionable whether Trammo would  survive. The  enormous  losses  in  the  Gas  Division  book, uncertainties about  whether  and  when Trammo would  be able to  unwind  the  positions in that book, and the existence of significant defaults under its credit agreements created a real prospect of immediate bankruptcy.  Trammo's external auditors determined that, because there were serious questions about the company's viability, including uncertainty as to whether Trammo could renew its revolving credit facility, it was necessary to add a going concern paragraph to their report to express "substantial doubt about the company's ability to continue as a going concern."

68.     Trammo incurred substantial costs in connection with its restructuring, including severance for terminated employees, losses on closing out trades in the discontinued businesses, costs related to terminating leases and closing down offices, retention  bonuses and other incentives to prevent key employees from abandoning the company to work for its competitors, fees paid to its banks to obtain waivers and restructure its revolving credit facility, and the fees of the attorneys, auditors and consultants that Trammo was compelled by its banks to retain or to pay for in connection with the restructuring of the company.  Such costs incurred by Trammo exceeded $58 million.

## COUNT I
### (Fraud)

69.     Plaintiff repeats and realleges the allegations made in paragraphs 1 through 68 of its Complaint, as if fully set forth herein.

70.     Smothermon repeatedly made false representations of material fact to Trammo, including, but not limited to, representations made through entries in the T&T System and the issuance of position reports to Trammo's management as described above.

71.     As shown by his Outlook notes, Smothermon knew that his representations were

false when made, and had access to facts that contradicted and demonstrated the falsity of those representations.

72.      Smothermon knowingly made these material, false representations for the purpose of deceiving Trammo for the reasons described above.

73.      Trammo reasonably and justifiably relied upon Smothermon's material, false representations.  Smothermon was a long-time employee who had sought and obtained the trust of Trammo's management and Trammo's Board of Directors, based on their belief in his sophistication and acumen in the markets and products he traded.  Smothermon exploited the trust reposed in him to perpetrate his fraud against Trammo.

74.      Smothermon's deceit was deliberate, wanton and willful.  He engaged in this fraud to protect his job and to garner exorbitant compensation.  Smothermon, by virtue of his positions as a director of Trammo and President of the Gas Division, knew the substantial harm to Trammo that his fraudulent scheme would cause.

75.      Trammo has suffered substantial monetary injury as a direct and proximate result of Smothermon's fraud, including, but not limited to, $228 million in trading losses, approximately $15.5 million in bonuses and phantom equity to Smothermon and other Gas Division employees, and restructuring costs exceeding $58 million.  The total of these items alone exceeds $300 million.

76.      Trammo is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $300 million as well as punitive damages.

## COUNT II
### (Constructive Fraud)

77.      Plaintiff repeats and realleges the allegations made in paragraphs 1 through 76 of its Complaint, as if fully set forth herein.

78.      A fiduciary and confidential relationship existed between Smothermon and

Trammo.

79.     While this relationship existed, Smothermon made material misrepresentations to
Trammo and omitted material facts concerning the value of positions in Trammo's trading book.
He did so through the making of false entries in Trammo's T&T System and in sending position
reports to Trammo's management that were based on these false entries.

80.     Smothermon's statements to Trammo were made with the intention of inducing
Trammo's reliance thereon.

81.     Trammo reasonably relied on these statements.

82.     Trammo has suffered substantial monetary injury as a direct and proximate result
of Smothermon's fraud.

83.     Trammo is entitled to compensatory damages.

## COUNT III
### (Constructive Trust)

84.     Plaintiff repeats and realleges the allegations made in paragraphs 1 through 83 of
its Complaint, as if fully set forth herein.

85.     A confidential and fiduciary relationship existed between Smothermon and
Trammo.

86.     Smothermon made material representations and promises to Trammo, including
representations concerning the value of positions in Trammo's trading book.

87.     Trammo transferred money to Smothermon based on these material representations
and promises.

88.     These material representations and promises were false when made.

89.     Trammo reasonably relied on these material representations and promises.

90.     Equity and good conscience demand that Smothermon not retain but return the

money transferred to him by Trammo because of these material representations and promises, including his May 2016 bonus.

## COUNT IV
### (Breach of Fiduciary Duties)

91.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 90 of its Complaint, as if fully set forth herein.

92.    Smothermon owed fiduciary duties to Trammo on the basis of their relationship of trust and confidence.

93.    Trammo placed trust and confidence in Smothermon, including by his appointment as President of the Gas Division.

94.    Smothermon accepted, assumed and was aware of this trust and confidence.

95.    With this trust and confidence, Smothermon exercised control and dominance over Trammo's Gas Division.  Smothermon was in a position of superior knowledge and access to information concerning the Gas Division, including with respect to Trammo's trading positions and the recording and valuation of these positions.

96.    Smothermon had discretion in the operation and management of the Gas Division and Trammo depended upon him to exercise this discretion in accordance with the trust and confidence afforded him and the fiduciary duties arising therefrom.

97.    Smothermon abused the trust and confidence Trammo afforded him, including through his fraudulent mis-recording and mismarking of Trammo's trading positions and his concealment thereof from Trammo.  By this conduct, Smothermon breached fiduciary duties to Trammo.

98.    Trammo was substantially harmed by Smothermon's abuse of trust and confidence and breach of fiduciary duties arising from Smothermon's fraudulent conduct.

99.    Trammo is entitled to compensatory and punitive damages.

## COUNT V
### (Faithless Servant)

100.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 99 of its Complaint, as if fully set forth herein.

101.    Smothermon was employed by Trammo at all relevant times.

102.    Smothermon had a duty to act faithfully and loyally in the performance of his responsibilities as an employee of Trammo.

103.    However, Smothermon acted in bad faith, disloyally and in derogation of his responsibilities to Trammo by knowingly mismarking positions in the Gas Division's trading book, directing operations employees to enter false information into the T&T System, and intentionally misrepresenting to Trammo's management the profits and losses of the Gas Division.

104.    Trammo had no knowledge of Smothermon's disloyal conduct until in or about September 2016.  In light of the absence of such knowledge, Trammo paid a bonus to Smothermon on May 31, 2016, as well as other remuneration.

105.    Accordingly, Smothermon should be required to forfeit to Trammo all money he received from Trammo during the period when he acted in breach of his duty to Trammo to act faithfully and loyally and any proceeds thereof, including, but not limited to, his salary during that period and the bonus he received from Trammo on May 31, 2016.

## COUNT VI
### (Unjust Enrichment)

106.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 105 of its Complaint, as if fully set forth herein.

107.    Smothermon was enriched through payments from Trammo, including in the form

of the bonus paid to Smothermon by Trammo on May 31, 2016.

108.    Smothermon was so enriched at Trammo's expense.

109.    For the reasons set forth herein, equity and good conscience demand that Smothermon not be permitted to retain any money he received from Trammo during the period in which he was engaged in his scheme to defraud Trammo and the proceeds thereof, including, but not limited to, the salary he received during that period and the bonus paid to him by Trammo on May 31, 2016.

110.    Accordingly, Smothermon should be ordered to return such payments in an amount to be determined at trial, but believed to be not less than $12 million, exclusive of interest and costs.

### COUNT VII
### (Money Had and Received)

111.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 110 of its Complaint, as if fully set forth herein.

112.    Smothermon received money belonging to Trammo including in the form of the bonus paid to Smothermon by Trammo on May 31, 2016.

113.    Smothermon benefitted from the receipt of this money from Trammo.

114.    Under principles of good conscience, Smothermon should not be allowed to retain this money for the reasons set forth herein.

115.    Smothermon should be ordered to return payments received from Trammo in an amount to be determined at trial but believed to be not less than $12 million, exclusive of interest and costs.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant in favor of Plaintiff as

follows:

     a.     Awarding Plaintiff damages in an amount to be determined at trial but believed to be in excess of $300 million, exclusive of interest and costs.

     b.     Awarding Plaintiff punitive damages in an amount to be determined at trial.

     c.     Ordering a constructive trust for the benefit of Plaintiff over the funds wrongfully received by Defendant and the proceeds thereof in an amount to be determined at trial but believed to be in excess of $12 million, exclusive of interest and costs.

     d.     Ordering disgorgement from Defendant and restitution to Plaintiff of the funds wrongfully received by Defendant and their proceeds in an amount to be determined at trial but believed to be in excess of $12 million, exclusive of interest and costs.

     e.     Awarding Plaintiff pre-judgment and post-judgment interest.

     f.     Awarding Plaintiff reasonable attorneys' fees and costs.

     g.     Awarding Plaintiff such other and further legal and equitable relief as the Court may deem just and proper.

Dated: May 30, 2022
       New York, New York

                            **DLA PIPER LLP (US)**

                            By: */s/ Jessica A. Masella*
                            Jessica A. Masella
                            Jeffrey D. Rotenberg
                            1251 Avenue of the Americas
                            New York, New York 10020
                            (212) 335-4500 (Phone)
                            (212) 335-4501 (Fax)
                            jessica.masella@us.dlapiper.com
                            jeffrey.rotenberg@us.dlapiper.com

                            *Attorneys for Plaintiff*